William J. Boyce, Justice
The main issue on appeal addresses Mandy Hong's individual liability for the actions of Shadow Creek Bay, Inc. ("Shadow Creek") in connection with its sale of a 6.24-acre tract.
After Shadow Creek signed an exclusive listing agreement with United Texas Realtors to sell the 6.24-acre tract, Shadow Creek used a different real estate broker to sell it and refused to pay a commission to United Texas Realtors. United Texas Realtors and its owner, William Frances Havey, Jr., sued Shadow Creek and its owners, including Mandy Hong,[1] to recover the commission due under its exclusive listing agreement with Shadow Creek.
The jury returned a verdict in favor of Havey on his breach of contract claim against Shadow Creek; the jury also answered "yes" to a question asking whether Mandy was individually liable under an alter ego theory, and "yes" to questions asking whether Mandy was individually liable for common law fraud and conspiracy. The jury awarded $30,500 in damages for Havey's unpaid commission and $55,750 in attorney's fees. The trial court signed a final judgment in conformity with the jury's verdict.
*878 We reverse the trial court's final judgment with respect to Mandy's individual liability in connection with Shadow Creek's exclusive listing agreement with United Texas Realtors. An affirmative answer to the alter ego question required evidence that Mandy used Shadow Creek to perpetrate an actual fraud "primarily for [her] direct personal benefit...." According to Havey, the fraud at issue is a material misrepresentation in the form of Shadow Creek's promise to pay him a commission under the exclusive listing agreement made with an intent not to perform as promised. Because there is no evidence that Shadow Creek's failure to pay Havey's promised commission was conduct done primarily for Mandy's direct personal benefit, we reverse and render judgment in favor of Mandy on alter ego liability. We reverse and render judgment in favor of Mandy on common law fraud and conspiracy because these claims are subject to a statutory bar. See Tex. Bus. Orgs. Code Ann. §§ 21.223, 21.224 (Vernon 2012). With respect to attorney's fees, we conclude that the evidence is legally insufficient to support the attorney's fee award in the trial court's final judgment; we reverse and remand for a redetermination of attorney's fees consistent with this court's opinion.
We affirm the remainder of the judgment.
BACKGROUND
Shadow Creek is a corporation owned by Mau Hong, his wife Mandy Hong, his niece Thu Ngo, and Thu Ngo's husband An Luu. Mau is Shadow Creek's president.
Shadow Creek owned a 6.24-acre tract in Pearland, Texas. The corporation financed the purchase of this tract through two loans issued by First International Bank and personally guaranteed by Mau, Mandy, Thu Ngo, and An Luu.
In 2010, Shadow Creek faced financial difficulties on two fronts. Shadow Creek was behind on its property tax payments and owed approximately $45,000 to the Shadow Creek Ranch Commercial Association. The corporation also was delinquent on its loan payments and owed approximately $1.728 million to the bank. These financial difficulties prompted efforts to sell the 6.24-acre tract.
Shadow Creek entered into a listing agreement under which United Texas Realtors would exclusively represent Shadow Creek in the sale of the 6.24-acre tract. The listing agreement provided that United Texas Realtors would earn a four percent commission contingent on the tract's sale.
Despite its exclusive listing agreement with United Texas Realtors, Shadow Creek sold the 6.24-acre tract to Avnee, L.P. in March 2011, pursuant to a sales contract procured by Henry Fuertes, a real estate agent with PSL Realty Enterprises, LLC, a different broker.
Havey sued Shadow Creek, PSL Realty, Fuertes, Mau, Mandy, Thu Ngo, An Luu, and Mui Ngo to recover a four percent commission on the tract's sale pursuant to Shadow Creek's exclusive listing agreement with United Texas Realtors. The jury returned a verdict in favor of Havey on the questions regarding his claims for breach of contract, common law fraud, conspiracy, and alter ego liability.
The facts underlying this dispute are discussed in greater detail below.
I. Facts
Mau and Mandy began working with Fuertes and PSL Realty in 2006. In late 2010, Mandy and her sister-in-law Mui Ngo visited Fuertes approximately once a week to discuss selling Shadow Creek's 6.24-acre tract. Fuertes understood that Shadow Creek was behind on its loan payments and property taxes; he testified that *879 Mandy and Mui Ngo were "pretty anxious" to sell the tract.
Fuertes attended a meeting at First International Bank with Mandy and Mui Ngo in October 2010. Fuertes, Mandy, and Mui Ngo met with loan officer Sally Li to discuss the status of Shadow Creek's loans; Mandy and Mui Ngo hoped Fuertes would "buy [them] more time because foreclosure seemed imminent." After the meeting, Fuertes agreed to help Mandy and Mui Ngo find a buyer for the 6.24-acre tract.
Havey, a real estate broker and the owner of United Texas Realtors, also was approached in November 2010 by Mandy and Mui Ngo to discuss selling the same 6.24-acre tract on behalf of Shadow Creek.
Havey testified that Mandy and Mui Ngo told him they "were being pressured by the bank because they were behind on the payments and the bank was threatening to foreclose." Havey agreed to help Mandy and Mui Ngo sell the 6.24-acre tract.
United Texas Realtors and Shadow Creek entered into a contract identified as a "Commercial Real Estate Listing Agreement Exclusive Right to Sell" in December 2010. The listing agreement provided that United Texas Realtors would represent Shadow Creek exclusively in the sale of the 6.24-acre tract, which would be marketed for $1.7 million. The listing agreement was effective from December 8, 2010, through March 31, 2011.
The listing agreement entitled United Texas Realtors to a four percent commission on the sales price if the 6.24-acre tract was sold "to anyone at any price on any terms" during the effective period. The listing agreement obligated Shadow Creek to refrain from (1) negotiating with prospective buyers who directly contacted Shadow Creek to purchase the 6.24-acre tract; and (2) entering into a listing agreement with another broker for the sale or exchange of the tract during the effective period.
Mau, Shadow Creek's president, testified that Mandy signed his name to the listing agreement with United Texas Realtors. Mau testified that he permitted Mandy to "make all the decisions" and "run" Shadow Creek.
After Mandy signed the listing agreement with United Texas Realtors, Havey began efforts to find a buyer for the 6.24-acre tract. International Assistance Corporation submitted a letter of intent to purchase the tract and proposed a $1.3 million sales price. Havey reviewed the letter of intent with Mau and Mandy; after additional negotiations, the parties agreed on a $1.4 million sales price. Mau and Mandy instructed Havey to go through with the sale.
Sally Li at First International Bank also reviewed International Assistance Corporation's letter of intent to purchase. In an email, Sally Li told Havey that the bank "want[ed] to move forward" with the sale and instructed Havey to "have the actual contract done and send to me ASAP."
Shadow Creek and International Assistance Corporation signed a sales contract on January 25, 2011; Mau signed as president of Shadow Creek. Mau testified that he did not read the sales contract before signing it. The sale to International Assistance Corporation was scheduled to close on March 7, 2011.
Havey continued to communicate with Mandy to facilitate the sale's closing. Havey sent an email to Mandy in early March 2011, addressing a discussion they had at an earlier meeting regarding a separate buyer interested in purchasing the 6.24-acre tract. Havey reminded Mandy of the listing agreement's terms and told her that "[i]f another group is interested in submitting an offer on the property their agent *880 needs to be talking to me and submitting any offer through me." Responding to Havey's email, Mandy said, "I know you will help us to sell with the better price so we don't owe [the] bank too much," and assured him that "when [the other buyer is] ready [to] make offer with contract then we will let them go through you ... I will keep you up to date don't worry...."
Mau and Mandy did not attend the March 7, 2011 closing and the sale was postponed. Havey testified that Mau and Mandy represented that "they were still negotiating with the bank on the remaining balance and how to handle that." In an April 8, 2011 email, Mandy told Havey: "I think the Bank try to sale [sic] [the 6.24-acre tract] by themselve [sic] or foreclose we have not heard anything from them yet ... I let you know if I receive[ ] anything from them."
Havey also communicated with First International Bank regarding the 6.24-acre tract's pending sale. In a March 14, 2011 email sent to bank attorney Misty Coné, Havey encouraged the bank to permit the sale to close instead of seeking to foreclose on the tract. Havey stated that Mandy did not "expect[ ] the bank to write everything above the $1.4 million off," and instead was "willing to work with the bank but is very limited on funds available to handle the closing costs and is looking for some help with regard to the remaining balance above the $1.4 million." Coné replied the same day and told Havey that the bank had "not heard any word relative to paying off the deficiency" and "suggest[ed] that efforts to close this deal begin with the sellers."
Havey did not know that Mandy continued to work with Fuertes to sell the 6.24-acre tract before and after the January 2011 sales contract with International Assistance Corporation was signed. Fuertes procured an offer from Avnee, L.P. to purchase the tract for $1.525 million; Shadow Creek and Avnee, L.P. signed the sales contract on February 11, 2011.
After the Avnee, L.P. sales contract was signed, Mandy continued to communicate with Fuertes regarding the sale. Mandy asked Fuertes "not to talk to [Havey]" and told him she had the situation "handled." In a March 10, 2011 email, Mandy told Fuertes she informed the bank about the "second buyer" and stated that "we will not sign for the first buyer."
The sale to Avnee, L.P. closed and the 6.24-acre tract was conveyed on March 23, 2011. Fuertes received a $45,750 commission on the sale.
After learning of the sale to Avnee, L.P., Havey emailed Mandy and Sally Li. He said he did "not understand the deceptive manner by which you and 1st International Bank handled the negotiations and the sale of the property when both you and the bank knew of my Exclusive Right To Sell Listing Agreement."
Avnee, L.P.'s $1.525 million purchase price left approximately $200,000 remaining due on Shadow Creek's loans with First International Bank. Sally Li testified that, after additional negotiations, the bank agreed to "release its lien" on the 6.24-acre tract in exchange for a $100,000 note executed by Shadow Creek. Mau personally guaranteed the note.
II. Procedural History
Havey sued Shadow Creek, PSL Realty, Fuertes, Mau, and Mandy in August 2011, asserting claims for breach of contract and tortious interference with contract. Havey amended his petition to add Mui Ngo, Thu Ngo, and An Luu as defendants, and to include allegations of common law fraud, statutory fraud, and conspiracy to commit fraud. Havey also sought to hold certain individual defendants individually liable as alter egos of Shadow Creek.
*881 The parties proceeded to a jury trial on January 26-28, 2016. At the close of trial, the jury answered a series of jury charge questions.
The jury answered "yes" as to Mau, Mandy, and Shadow Creek in response to Question No. 1, which asked: "Did any of the following persons or entities commit fraud against William Frances Havey, Jr. d/b/a United Texas Realtors?" The fraud finding is predicated on a "material misrepresentation;" in turn, "misrepresentation" is defined in Question No. 1 as "a promise of future performance made with an intent, at the time the promise was made, not to perform as promised." The jury awarded Havey $30,500 as fraud damages in response to Question No. 2.
The jury answered "yes" as to Mandy and Mui Ngo in response to Question No. 3, which asked: "Were any of the following people or entities part of a conspiracy that damaged William Frances Havey, Jr. d/b/a United Texas Realtors?" The jury awarded Havey $30,500 as damages in connection with this claim in response to Question No. 4.
The jury answered "yes" in response to Question No. 5, which asked whether Shadow Creek "fail[ed] to comply" with the listing agreement it executed with United Texas Realtors. The jury awarded Havey $30,500 in contract damages in response to Question No. 6.
The jury answered "no" as to Mau and Mandy in response to Question No. 7 on statutory fraud. The jury answered "no" as to Fuertes and PSL Realty in response to Question No. 10 on tortious interference.
Question No. 9 is a key charge question for purposes of this appeal. The jury answered "yes" in response to Question No. 9, which reads as follows:
Question No. 9
Is Mandy Hong responsible for the conduct of Shadow Creek Bay, Inc.?
Mandy Hong is "responsible" for the conduct of Shadow Creek Bay, Inc. if Shadow Creek Bay, Inc. was organized and operates as a mere tool or business conduit of Mandy Hong; there was such unity between Shadow Creek Bay, Inc. and Mandy Hong that the separateness of Shadow Creek Bay, Inc. had ceased and holding only Shadow Creek Bay, Inc. responsible would result in injustice; and Mandy Hong caused Shadow Creek Bay, Inc. to be used for the purpose of perpetrating and did perpetrate an actual fraud on William Frances Havey, Jr. d/b/a United Texas Realtors primarily for the direct personal benefit of Mandy Hong.
In deciding whether there was such unity between Shadow Creek Bay, Inc. and Mandy Hong that the separateness of Shadow Creek Bay, Inc. had ceased, you are to consider the total dealings of Shadow Creek Bay, Inc. and Mandy Hong, including-
1. The degree to which Shadow Creek Bay, Inc.'s property had been kept separate from that of Mandy Hong;
2. The amount of financial interest, ownership, and control Mandy Hong maintained over Shadow Creek Bay, Inc.; and
3. Whether Shadow Creek Bay, Inc. had been used for the personal purposes of Mandy Hong.
Question No. 9 tracks Texas Pattern Jury Charges 108.1 and 108.2 addressing standards for piercing the corporate veil based on an alter ego theory. See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business PJC 108.1, 108.2 (2016). This question incorporates the statutory standards for imposing liability on individuals under section 21.223 of the Texas Business Organizations Code. See Tex. Bus. Orgs. Code Ann. § 21.223. Havey did not object to Question *882 No. 9 at the charge conference. Shadow Creek and Mandy objected to Question No. 9 at the charge conference on no evidence grounds. No party challenges Question No. 9's wording or the correctness of the legal standards it sets forth.
The jury awarded Havey $55,750 as reasonable attorney's fees in response to Question No. 12.
Havey filed a motion asking the trial court to sign a final judgment against Shadow Creek and Mandy for $30,500 in actual damages plus attorney's fees and costs. Shadow Creek and Mandy responded to Havey's motion for entry of judgment and asserted that (1) there is no evidence to support the jury's response to Question No. 9, which addressed Mandy's individual liability as Shadow Creek's alter ego; (2) liability for common law fraud and conspiracy is barred by Texas Business Organizations Code sections 21.223 and 21.224 as a matter of law, which makes the jury's responses to Questions No. 1 and 3 immaterial; and (3) Havey's attorney's fee evidence did not comply with itemization requirements.
The trial court signed a final judgment on August 25, 2016, awarding Havey $30,500 in actual damages and $55,750 in attorney's fees. The final judgment holds Shadow Creek and Mandy jointly and severally liable for the damages and attorney's fees.
Shadow Creek and Mandy filed a motion for new trial, which was overruled by operation of law. See Tex. R. Civ. P. 329b(c). Shadow Creek and Mandy timely appealed.
ANALYSIS
The main dispute on appeal is whether Mandy is individually liable for the damages awarded in the trial court's final judgment. Shadow Creek's liability is not challenged.
Havey has three potential routes to Mandy's individual liability based on the jury's "yes" answers to Question No. 1 addressing common law fraud; Question No. 3 addressing conspiracy; and Question No. 9 addressing alter ego liability.
Mandy raises the following appellate issues.
1. The jury's "yes" answer in response to Question No. 9 is supported by legally and factually insufficient evidence.
2. The jury's "yes" answers in response to Questions No. 1 and 3 are immaterial because these claims are barred by Texas Business Organizations Code sections 21.223 and 21.224 as a matter of law.
3. The jury's "yes" answers in response to Questions No. 1 and 3 are supported by legally and factually insufficient evidence.
4. The economic loss rule bars the damages assessed for the jury's "yes" answers in response to Questions No. 1 and 3.
Shadow Creek also challenges the sufficiency of the evidence supporting the attorney's fee award included in the trial court's final judgment, asserting that the evidence failed to provide the required itemized detail of the work performed and failed to segregate fees into categories related to recoverable claims.
We address these issues in turn.
I. Mandy's Individual Liability Based on Shadow Creek's Dealings with United Texas Realtors
Mandy asserts in her first two issues that (1) the evidence is legally insufficient to support the jury's "yes" answer in response to Question No. 9; and (2) sections 21.223 and 21.224 foreclose her individual liability for common law fraud and conspiracy, *883 making the jury's "yes" answers in response to Questions No. 1 and 3 immaterial.
A. Statutory Standards for Individual Liability
Question No. 9 submits the standards set forth in Texas Pattern Jury Charges 108.1 and 108.2, as well as Texas Business Organizations Code section 21.223. See Tex. Bus. Orgs. Code Ann. § 21.223 ; Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business PJC 108.1, 108.2 (2016).
These standards reflect legislative limits on recovery from an individual based upon a corporation's obligations. See Tex. Bus. Orgs. Code Ann. §§ 21.223, 21.224.[2] Mandy's status as an "owner" of Shadow Creek is not disputed.
The Texas Business Organizations Code provides, in relevant part, that:
(a) [a] holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
* * *
(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory....
Id. § 21.223(a), (a)(2). Section 21.223(b) provides the following exception to this statutory protection:
Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.
Id. § 21.223(b).[3] Under section 21.223, an alter ego theory may be used to pierce the corporate veil and establish individual liability in connection with a claim arising from a corporate contractual obligation only if actual fraud was perpetrated primarily for the direct personal benefit of the individual. Id. § 21.223(a), (b); see also TecLogistics, Inc. v. Dresser-Rand Group, Inc. , 527 S.W.3d 589, 596 (Tex. App.-Houston [14th Dist.] 2017, no pet.) ; Lone Star Air Sys., Ltd. v. Powers , 401 S.W.3d 855, 863 (Tex. App.-Houston [14th Dist.] 2013, no pet.) ; Priddy v. Rawson , 282 S.W.3d 588, 601 (Tex. App.-Houston [14th Dist.] 2009, pet. denied). This statute is "exclusive and preempts any other liability imposed for that obligation under common *884 law or otherwise." Tex. Bus. Orgs. Code Ann. § 21.224.
B. Application of Standards
Mandy asserts in her first issue that the evidence is legally insufficient to support the jury's "yes" answer in response to Question No. 9 because the record does not show that she employed Shadow Creek to perpetrate an actual fraud primarily for her direct personal benefit. See itation index="11" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2021.224">id. § 21.223(b). Mandy preserved this contention at the charge conference and post-verdict.[4] See Halim v. Ramchandani , 203 S.W.3d 482, 487 (Tex. App.-Houston [14th Dist.] 2006, no pet.).
1. Standard of review
When considering a legal sufficiency challenge we review the evidence in the light most favorable to the jury's finding, crediting favorable evidence if a reasonable fact finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. City of Keller v. Wilson , 168 S.W.3d 802, 822, 827 (Tex. 2005). When an appellant challenges the legal sufficiency of a finding on which it did not have the burden of proof, it must show that there is no evidence to support the finding. Id. at 810.
We sustain a legal sufficiency point if the record shows that (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove the vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. Id. The jury is the sole judge of witness credibility and the weight to be assigned to a witness's testimony. Id. at 819.
2. The evidence is legally insufficient to support the jury's "yes" answer to Question No. 9
Question No. 9 instructed the jury that Mandy is individually "responsible for the conduct of Shadow Creek Bay, Inc." if Mandy "caused Shadow Creek Bay, Inc. to be used for the purpose of perpetrating and did perpetrate an actual fraud on William Frances Havey, Jr. d/b/a United Texas Realtors primarily for the direct personal benefit of Mandy Hong."
Havey contends that Shadow Creek perpetrated a fraud when it made a material misrepresentation by promising to pay his commission under the exclusive listing agreement with an intent not to perform at the time it made this promise. The promise was to pay Havey's commission based upon any sale during the exclusivity period to any buyer for any amount. To support the finding in response to Question No. 9 that Mandy caused Shadow Creek to be used to perpetrate this fraud on Havey primarily for her direct personal benefit, Havey points to the following testimony from Mau:
*885 Q. And all four of you had signed a note with the bank for-to finance this piece of property, correct?
A. Yes, sir.
Q. All right. And y'all guaranteed the note?
A. Yes, sir.
Q. And you weren't able to pay that note?
A. Yeah, I couldn't make the payments.
Q. Right. So you set out to have the property sold?
A. Yes, sir.
* * *
Q. All right. And you wanted to sell that property because you wanted all four of you to be released from your personal guaranties; isn't that right?
A. Yes, sir, that's right.
Q. And that was the goal, to get all four of you off the hook with that bank?
A. Yes, sir, that's right. Uh-huh.
* * *
Q. ... All you were concerned about was somebody selling this property and getting you off the note, isn't that true?
A. Yes.
Havey argues that this testimony shows "the decision was made to sell the [6.24-acre tract] so that the Hongs and family could avoid the personal liability for the guarantee," and that these actions "were taken solely for the purpose of avoiding personal liability for owing additional monies."
We assume without deciding that sufficient evidence supports section 21.223(b)'s "actual fraud" requirement as submitted in Question No. 9. We conclude that section 21.223(b)'s "primarily for the direct personal benefit" prong as submitted in Question No. 9 is not supported by legally sufficient evidence on this record.
Section 21.223 does not define the phrase "primarily for the direct personal benefit." In cases in which the direct personal benefit showing has been met, evidence showed that funds derived from the corporation's allegedly fraudulent conduct were pocketed by or diverted to the individual defendant. See Simplified Dev. Corp. v. Garfield , No. 14-06-00526-CV, 2008 WL 399433, at *5-6 (Tex. App.-Houston [14th Dist.] Feb. 14, 2008, pet. denied) (mem. op.) (defendant misrepresented to plaintiff that plaintiff would receive stock options in defendant's company, but stock was wholly retained by defendant; evidence legally sufficient to show individual defendant was "the primary beneficiary of the fraudulent conduct" where defendant later sold five percent of company for $1 million); Farr v. Sun World Sav. Ass'n , 810 S.W.2d 294, 297-98 (Tex. App.-El Paso 1991, no writ) (interpreting section 21.223's statutory predecessor, court concluded the evidence was legally sufficient to show individual defendant's "actual fraud was intended to provide a direct personal benefit to him" where defendant used company funds to pay his personal stock purchase loans); see also TransPecos Banks v. Strobach , 487 S.W.3d 722, 736 (Tex. App.-El Paso 2016, no pet.) (upholding summary judgment denying bank's attempt to pierce the corporate veil; court noted the absence of evidence that the shareholder distributed corporation's assets to herself or anyone else); Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd. , 237 S.W.3d 379, 388 (Tex. App.-Houston [14th Dist.] 2007, no pet.) (evidence legally insufficient to support jury's alter ego finding where evidence did not show that fraudulently retained or misappropriated payments were "deposited ... into [defendant's *886 ] own personal account or used ... to purchase personal items or pay personal debts"); Bates v. de Tournillon , No. 07-03-0257-CV, 2006 WL 265474, at *3 (Tex. App.-Amarillo Feb. 3, 2006, no pet.) (mem. op.) (reversing finding that corporate veil should be pierced, court noted, among other things, absence of evidence indicating the individual defendant "personally made any use of the items" he removed from the company).
In contrast, evidence showing that fraudulently procured funds were used to satisfy a corporation's financial obligations cuts against the notion that the fraud was perpetrated primarily for the direct personal benefit of an individual. See Morgan v. Fuller , No. 07-15-00314-CV, 2016 WL 2766106, at *2-3 (Tex. App.-Amarillo May 11, 2016, no pet.) (mem. op.); see also Scott v. McKay , No. 12-02-00195-CV, 2003 WL 21998629, at *2 (Tex. App.-Tyler Aug. 20, 2003, no pet.) (mem. op.) (in appeal from bench trial, court affirmed trial court's conclusion that "primarily for the direct personal benefit" showing was not met where funds from allegedly fraudulently obtained loan were deposited in corporation's bank account and used to pay corporate obligations and salaries).
For example, the plaintiff in Morgan v. Fuller asserted that the "primarily for the direct personal benefit" requirement was met where the plaintiff's payment was procured by fraudulent means and used to pay company debts. Morgan , 2016 WL 2766106, at *2. This benefited the individual defendant, the plaintiff argued, because the defendant's ownership interest in the company "retained its value" as long as the company paid its bills. Id.
Rejecting the plaintiff's argument, the court pointed out that "the monies paid by [the plaintiff] were not pocketed by or diverted to" the defendant. Id. Emphasizing that the funds were used to satisfy corporate obligations, the court held that this evidence "tend[s] to contradict the notion that the fraud ... was perpetrated for the primary, direct benefit of" the defendant. Id. at *3.
Here, the required primary direct personal benefit to Mandy is missing. The asserted fraud is Shadow Creek's contractual promise, made without an intent to fulfill it, to pay Havey's commission upon the tract's sale to any buyer for any amount during the exclusivity period. But Shadow Creek made this promise in December 2010, before Fuertes procured an offer from Avnee, L.P. to purchase the tract for $1.525 million and before Shadow Creek and Avnee, L.P. signed a contract for the tract's sale. The tract was sold during the exclusivity period, but Shadow Creek refused to pay the promised commission to Havey. The extent of Mandy's personal liability on the guaranty is not affected by whether Shadow Creek did or did not pay Havey's promised commission because that commission was owed for any sale occurring during the exclusivity period-regardless of who bought the tract and how much was paid. At most, there is only an attenuated connection between the asserted fraudulent conduct at issue in this case and the asserted benefit conferred on Mandy based on that conduct. An attenuated connection of this nature will not suffice to establish individual liability for the corporation's acts. See Viajes Gerpa, S.A. v. Fazeli , 522 S.W.3d 524, 533-35 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) ; see also Rutherford v. Atwood , No. 01-00-00113-CV, 2003 WL 22053687, at *4-5 (Tex. App.-Houston [1st Dist.] Aug. 29, 2003, no pet.) (mem. op.) (no evidence that corporate affiliate's personal withdrawals from corporate entity's account related to remodeling transaction at issue).
In Viajes Gerpa, S.A. v. Fazeli , we considered the legal sufficiency of the evidence supporting an alter ego theory to *887 pierce the corporate veil and impose personal liability on an individual. Viajes Gerpa S.A. , 522 S.W.3d at 533-35. Underlying the dispute in Viajes Gerpa, S.A. was a 2007 settlement agreement that required The Ticket Company and its president, Seyed Fazeli, to remit payments to the plaintiff and other travel agencies to compensate for a failure to procure tickets to the World Cup Soccer tournament. Id. at 527-28. After The Ticket Company failed to make its required payments, the plaintiff sued Fazeli and others alleging that Fazeli was individually liable under section 21.223 for The Ticket Company's debts created pursuant to the 2007 settlement agreement. Id. at 529 (citing Tex. Bus. Orgs. Code Ann. § 21.223 ). The jury returned a verdict for the plaintiff on its alter ego claim. On the defendants' motion, the trial court rendered judgment for Fazeli. Id. at 530.
We stated as follows: "[T]o support individual liability under section 21.223, there must be evidence of direct personal benefit to [Fazeli] resulting from fraud in connection to The Ticket Company and the [settlement agreement] with [the plaintiff]...." Id. at 534 (emphasis in original). The evidence showed that Fazeli used The Ticket Company's funds to pay his mortgage, and the Company's banking records reflected regular large cash withdrawals. Id. at 533. Concluding that the evidence was legally insufficient to show that Fazeli used The Ticket Company primarily for his direct personal benefit, we stated that the evidence "reflect[ed] general (mis)handling of corporate accounts, record keeping, and operations," but failed to demonstrate that the fraudulent conduct was related to the 2007 settlement agreement. Id. at 535.
We apply this teaching to Havey's assertion that the evidence is legally sufficient to show "that Mandy "perpetrate[d] an actual fraud on [Havey] d/b/a United Texas Realtors primarily for [her] direct personal benefit."
The evidence does not show that the unpaid real estate commission owed to United Texas Realtors was pocketed by or diverted to Mandy. We reject Havey's contention because the evidence does not show a direct personal benefit to Mandy from the alleged fraud, nor does the evidence show that the alleged fraud was perpetrated primarily to benefit Mandy. See Simplified Dev. Corp. , 2008 WL 399433, at *5-6 ; Farr , 810 S.W.2d at 297-98. Havey sought to recover the four percent commission due under the Shadow Creek-United Texas Realtors exclusive listing agreement upon the sale of the 6.24-acre tract. This commission was not directed to Mandy. The record is devoid of any evidence showing that the failure to pay Havey's commission was perpetrated "primarily for [Mandy's] direct personal benefit." See Simplified Dev. Corp. , 2008 WL 399433, at *5-6 ; Farr , 810 S.W.2d at 297-98.
Havey points to the higher sales price paid by Avnee, L.P. as evidence that Mandy acted "primarily for her direct personal benefit" because the sale to Avnee, L.P. reduced her liability on her personal guaranty stemming from Shadow Creek's debt. We emphasize again that the alleged fraud is Shadow Creek's promise in December 2010 to pay Havey a commission without an intent to fulfill the promise. This alleged fraud occurred before Fuertes procured an offer from Avnee, L.P. to purchase the tract for $1.525 million. The damages for the alleged fraud occurred when Shadow Creek failed to pay Havey's commission based upon a sale consummated during the exclusivity period-this alleged fraud is not based on selling or failing to sell the land to a particular purchaser for a particular price. On this record, Shadow Creek's failure to pay Havey's *888 commission is neither "primarily" nor "direct[ly]" connected to the asserted personal benefit to Mandy because Shadow Creek promised to pay Havey's commission for any sale during the exclusivity period to any buyer at any price; paying or not paying the commission to Havey did not affect the scope of Mandy's personal liability on the guarantee.
Havey also asserts that Mandy controlled Shadow Creek and made all of the corporation's business decisions. Havey contends that Shadow Creek was "undercapitalized [because] it only owned one parcel of land which it did not have the resources to pay for."
As we recognized in Priddy v. Rawson , evidence of this nature does not satisfy section 21.223 absent additional evidence showing that the individual defendant "perpetrated an actual fraud primarily for [the defendant's] personal benefit." Priddy v. Rawson , 282 S.W.3d at 601 (citing Tex. Bus. Orgs. Code Ann. § 21.223 ). Because legally sufficient evidence does not support the finding that Mandy used Shadow Creek to perpetrate an actual fraud primarily for her direct personal benefit, Mandy cannot be held liable individually as Shadow Creek's alter ego.
We sustain Mandy's first issue. Because we conclude that the evidence is legally insufficient to support the jury's "yes" answer in response to Question No. 9, we do not address Mandy's factual sufficiency challenge to this finding. See Tex. R. App. P. 47.1 ; IKON Office Sols., Inc. v. Eifert , 125 S.W.3d 113, 123 (Tex. App.-Houston [14th Dist.] 2003, pet. denied).
C. Application of the Statutory Bar
Mandy asserts in her second issue that the jury's common law fraud and conspiracy findings in Questions No. 1 and 3 are immaterial because the claims are statutorily barred by sections 21.223 and 21.224 as "common law claims to establish contract liability under a corporate obligation." See Tex. Bus. Orgs. Code Ann. §§ 21.223, 21.224. Mandy preserved this argument by asserting it at the charge conference and post-verdict.[5] See BP Am. Prod. Co. v. Red Deer Res., LLC , 526 S.W.3d 389, 402 (Tex. 2017) ; Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co. , 235 S.W.3d 695, 704 (Tex. 2007).
A jury question is immaterial when (1) the question should not have been submitted, (2) the question calls for a finding beyond the province of the jury, such as a question of law, (3) the question was properly submitted but has been rendered immaterial by other findings, or (4) when the answer to the question cannot alter the effect of the verdict. Se. Pipe Line Co., Inc. v. Tichacek , 997 S.W.2d 166, 172 (Tex. 1999) ; City of Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995). Because "immaterial answers cannot support a judgment," the jury's answer to an immaterial question is properly disregarded. BP Am. Prod. Co. , 526 S.W.3d at 402.
*889 By its unambiguous terms, section 21.223's statutory protection applies to a claim if:
1. the entity with which the individual defendant has a relationship is a corporation;
2. the defendant's relationship with the corporation is that of a "holder of shares, an owner of any beneficial interest in shares, or a subscriber of shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation;"
3. the liability at issue arises from "any contractual obligation of the corporation or any matter relating to or arising from the obligation;"
4. the plaintiff is the corporation or the corporation's obligees; and
5. the basis for the individual defendant's liability is that the defendant "is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory."
See Tex. Bus. Orgs. Code Ann. § 21.223 ; see also TecLogistics, Inc. , 527 S.W.3d at 597-98.
If these requirements are met, then a claim against an individual defendant may proceed only if actual fraud was perpetrated primarily for the direct personal benefit of the individual. Tex. Bus. Orgs. Code Ann. § 21.223(a), (b) ; see also TecLogistics, Inc. , 527 S.W.3d at 596 ; Priddy , 282 S.W.3d at 601. Section 21.223's liability scheme is "exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Tex. Bus. Orgs. Code Ann. § 21.224.
Here, section 21.223's five requirements are established as a matter of law with regard to liability for common law fraud and conspiracy.
First, the parties do not dispute that Shadow Creek is a corporation.
Second, the evidence conclusively establishes (and the parties do not dispute) that Mandy is an "owner" of Shadow Creek. Mau testified regarding Shadow Creek's ownership as follows:
Q. There were other owners of [Shadow Creek] that was your wife, Mandy-
A. Yes, sir.
Q. -your niece, Thu Ngo and her husband, An Luu, correct?
A. Yes, sir.
Mau's testimony regarding Shadow Creek's ownership was uncontroverted. Havey does not dispute Mandy's owner status on appeal.
Third, Havey seeks to impose common law fraud and conspiracy liability with respect to a contractual obligation of Shadow Creek, namely, the commission due under the Shadow Creek-United Texas Realtors exclusive listing agreement.
In his second amended petition, Havey asserted as the basis for his common law fraud claim that "[t]he Hong Defendants represented to Havey that he would receive a payment after they marketed the property and found a buyer"-a reference to the four percent commission agreed to in the Shadow Creek-United Texas Realtors exclusive listing agreement. Similarly, Havey's petition includes a fraud by nondisclosure claim that asserts, "[t]he Hong Defendants knowingly concealed and failed to disclose material facts related to the Listing Agreement-Exclusive Right to Sell contract." Havey sought as damages his commission from the tract's sale. Moreover, the evidence and testimony presented at trial focused on the Shadow Creek-United Texas Realtors exclusive listing agreement, actions that allegedly violated *890 the terms of the agreement, and the resulting damages.
Fourth, Havey and United Texas Realtors are obligees of Shadow Creek with respect to the contractual obligation under the exclusive listing agreement made the basis of this suit. See Obligee , Black's Law Dictionary (10th ed. 2014) ("One to whom an obligation is owed[.]"). Under his common law fraud and conspiracy theories Havey sought to recover the four percent commission due at the sale of the 6.24-acre tract-an obligation owed by Shadow Creek to United Texas Realtors as set forth in their exclusive listing agreement.
Finally, Havey's attempt to impose liability based on common law fraud and conspiracy falls within section 21.223's reach. See Tex. Bus. Orgs. Code Ann. § 21.223(b)(2) (precluding claims and theories asserting "that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory"); see also TecLogistics, Inc. , 527 S.W.3d at 598 ( section 21.223 precluded plaintiff's fraud claim against the company's president); Lone Star Air Sys., Ltd. , 401 S.W.3d at 862-63 ( section 21.223 precluded plaintiff's fraud claim against the company's owner).
Because Havey's common law fraud and conspiracy theories fall within section 21.223's statutory reach, Havey may recover under these theories only if actual fraud was perpetrated primarily for Mandy's direct personal benefit. See Tex. Bus. Orgs. Code Ann. §§ 21.223, 21.224.
As discussed above, no evidence supports a finding under Question No. 9 that Mandy perpetrated the alleged fraud primarily for her direct personal benefit. Accordingly, sections 21.223 and 21.224 bar the imposition of liability on Mandy for common law fraud and conspiracy.
Responding to Mandy's statutory bar argument, Havey asserts only that section 21.223 relates "to debts that are created by the corporation," and does "not preempt any of the claims brought by [Havey] in the trial court." We rejected this argument in TecLogistics, Inc. See TecLogistics, Inc. , 527 S.W.3d at 597-98 ( section 21.223 applies to a "corporate contractual obligation"). Havey does not explain how his reasoning supports excluding the common law fraud and conspiracy theories of liability from section 21.223's unambiguous statutory bar-both theories seek relief arising in connection with a debt created when Shadow Creek sold the 6.24-acre tract using a different agent during the effective period of United Texas Realtors' exclusive listing agreement.
We conclude that, because sections 21.223 and 21.224 bar common law fraud and conspiracy liability, the jury's "yes" answers in response to Questions No. 1 and 3 are immaterial and cannot support Mandy's individual liability.
We sustain Mandy's second issue. We need not and do not address Mandy's third and fourth issues, in which Mandy challenges the sufficiency of the evidence and the economic loss rule. See Tex. R. App. P. 47.1 ; Custom Transit, L.P. v. Flatrolled Steel, Inc. , 375 S.W.3d 337, 346 (Tex. App.-Houston [14th Dist.] 2012, pet. denied) ; IKON Office Sols., Inc. , 125 S.W.3d at 123.
II. Attorney's Fees
Shadow Creek asserts that Havey's attorney's fee award is not supported by sufficient evidence because the proffered testimony did not (1) provide itemized detail of the work performed; or (2) segregate fees into categories related to recoverable claims. Because we conclude that the attorney's fee evidence did not provide sufficient details of the work performed, *891 we do not reach the argument addressing segregation.
A party prevailing on a breach of contract claim is entitled to recover reasonable attorney's fees. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 2015). The party seeking attorney's fees bears the burden of proof. In re Nat'l Lloyds Ins. Co. , 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding).
A party employs the lodestar method to prove its attorney's fees by submitting proof "showing the hours worked for each of the attorneys multiplied by the applicable hourly rate for a total fee...." Auz v. Cisneros , 477 S.W.3d 355, 360 (Tex. App.-Houston [14th Dist.] 2015, no pet.). This method of proof requires that the relevant evidence satisfy the requirements of El Apple I, Ltd. v. Olivas , 370 S.W.3d 757 (Tex. 2012). Id. at 359-60 (citing Long v. Griffin , 442 S.W.3d 253, 255 (Tex. 2014) (per curiam) ). The El Apple I, Ltd. requirements for the lodestar method similarly apply when attorney's fees are assessed by the jury. See United Nat'l Ins. Co. v. AMJ Invs., LLC , 447 S.W.3d 1, 16-17 (Tex. App.-Houston [14th Dist.] 2014, pet. dism'd).
"Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps." El Apple I, Ltd. , 370 S.W.3d at 760. First, evidence must show the reasonable hours spent by the attorneys in the case and a reasonable hourly rate for such work. Id. The number of such hours is then multiplied by the applicable rate, and the product is the base fee or lodestar. Id. The base fee may be adjusted up or down if necessary to arrive at a reasonable fee. Id.
The lodestar method seeks to provide a relatively objective measure of attorney's fees, but has been criticized "for providing a financial incentive for counsel to expend excessive time in unjustified work and for creating a disincentive to early settlement." Id. at 762. To avoid these drawbacks, " 'a party choosing the lodestar method of proving attorney's fees must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application.' " United Nat'l Ins. Co. , 447 S.W.3d at 16 (quoting Long , 442 S.W.3d at 253 ).
The starting point for determining a lodestar fee award is "the number of hours reasonably expended on the litigation." El Apple I, Ltd. , 370 S.W.3d at 762. (internal quotation omitted). From that basis, the party seeking attorney's fees must "provide sufficient details of the work performed," which "includes, at a minimum, documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." Id. at 764. "An attorney could, of course, testify to these details, but in all but the simplest cases, the attorney would probably have to refer to some type of record or documentation to provide this information." Id. at 763.
In El Apple I, Ltd. , the court concluded that the plaintiff's evidence was legally insufficient to support an award of fees where it did not indicate how many of the 890 hours spent on the case "were devoted to any particular task or category." Id. Without such evidence, the court concluded, it "could not discern ... how many hours each of the tasks required and whether that time was reasonable." Id. ; see also Saad v. Valdez , No. 14-15-00845-CV, 2017 WL 1181241, at *22-23 (Tex. App.-Houston [14th Dist.] March 30, 2017, no pet.) (mem. op.) (attorney's fee evidence legally insufficient where attorney "failed to testify about specific tasks performed by the five different attorneys or the time spent on specific tasks"); United Nat'l Ins. Co. , 447 S.W.3d at 16-17 (evidence legally *892 insufficient to support attorney's fee award where "testimony about the number of hours of work performed during certain phases of litigation either were not linked to specific tasks or lacked the specificity required for meaningful review").
Here, Havey prevailed on his breach of contract claim against Shadow Creek and was entitled to recover attorney's fees on that basis. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001.[6] Havey employed the lodestar method to establish attorney's fees for services performed through the end of trial and offered evidence of the hours worked multiplied by the hourly rate of the person who performed the work. See Auz , 477 S.W.3d at 360 ; Long , 442 S.W.3d at 255. Grissom, Havey's attorney, testified as follows:
• "I am a licensed attorney here in the state of Texas and have been licensed since November of 1976. I graduated law school at The University of Houston and have been practicing law since November, 1976 in the state of Texas."
• "I am very familiar with the fees that are customary and usual in this area. I've tried many, many cases in Houston, Galveston, Austin, Dallas, down in the Valley, all over the state of Texas. We do primarily business and environmental litigation at our firm."
• "[This case] was a-as you can see, the number of issues in it, it is considered a complex case because of the number of issues that are dealing with contract, fraud, tortious interference with contract, conspiracy."
• "I charge a rate of $250 an hour."
• "I've kept my hours on that as it relates to this lawsuit; and I've also taken into consideration, again, the complexity of the case, the time it took to devote to this, exploring all the issues, taking depositions, responding to discovery, sending out discovery. I've taken into consideration the fact that it takes away from other cases and other work that we have at our office to do."
• "[U]p until now, we had 182.9 hours, which was-at $250, which was $48,326.50; and I'll say that that's broken down on the issue of mainly the contract issue...."
• "I have carved out of that 182 hours. That does not include approximately 30 hours that we devoted strictly to the tortious interference issue of the case...."
• Through trial, "we have another 30 hours or $7500 in addition" for a total of $55,826.
Grissom did not present time records or other documentary evidence at trial to substantiate the attorney's fee request. The jury determined that Havey's reasonable and necessary attorney's fees for representation through trial equaled $55,750; this amount was awarded to Havey in the trial court's final judgment.
We conclude that the evidence at trial did not provide a legally sufficient basis for the attorney's fee award included in the trial court's final judgment because it lacked the specificity necessary for the fact finder to make a meaningful lodestar determination.
*893 Grissom testified that he expended 182.9 hours on the case with an additional 30 hours spent at trial. Although Grissom referenced time spent taking depositions and sending and responding to discovery, the evidence did not allocate the hours spent on the case among these particular tasks or categories of work. Similarly, the evidence did not indicate how many hours were devoted to other aspects of the litigation evident from the appellate record, such as pre-trial motion practice and trial preparation.[7]
"[G]eneralities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method." Long , 442 S.W.3d at 255. We conclude the evidence is legally insufficient to support the amount of attorney's fees awarded pursuant to the lodestar method because no evidence indicated the amount of time expended on specific tasks for which attorney's fees may be recovered. See id. at 256 ; El Apple I, Ltd. , 370 S.W.3d at 765 ; Saad , 2017 WL 1181241, at *22-23 ; United Nat'l Ins. Co. , 447 S.W.3d at 16-17.
Havey responds by asserting that the jury was not required to hear evidence on each of eight factors enumerated in Arthur Andersen & Co. v. Perry Equipment Corp. , 945 S.W.2d 812, 818 (Tex. 1997).
Havey's contention is correct as far as it goes-courts have stated that attorney's fee evidence need not address all eight of the Arthur Andersen factors. See, e.g., Santos v. Tex. Enters., Inc. , No. 03-09-00579-CV, 2010 WL 4054479, at *2 (Tex. App.-Austin Oct. 15, 2010, no pet.) (mem. op.); de Leon v. Tesco Corp. , No. 14-04-00513-CV, 2006 WL 3313357, at *2 (Tex. App.-Houston [14th Dist.] Nov. 16, 2006, no pet.) (mem. op.).
But Havey's contention does not address the Supreme Court of Texas's requirement that parties utilizing the lodestar method must "include[ ], at a minimum, documentation of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." El Apple I, Ltd. , 370 S.W.3d at 764 ; see also Long , 442 S.W.3d at 255. As discussed above, Havey did not present any evidence allocating the hours spent on the case among specific tasks. Therefore, the trial court's attorney's fee award is not supported by legally sufficient evidence. See Long , 442 S.W.3d at 255 ; El Apple I, Ltd. , 370 S.W.3d at 764.
Where evidence fails to satisfy the El Apple I, Ltd. standards regarding the details of the work performed, the proper remedy is to remand the issue for a redetermination of fees. See Long , 442 S.W.3d at 256 (where "no legally sufficient information support[ed] the amount of attorney's fees the trial court awarded," attorney's fees award was reversed and remanded for a redetermination); City of Laredo v. Montano , 414 S.W.3d 731, 736-37 (Tex. 2013) (per curiam) (where party's attorney's fee testimony lacked the level of detail required by El Apple I, Ltd. , attorney's fee award was reversed and remanded); El Apple I, Ltd. , 370 S.W.3d at 765 ("Because the affidavits and other evidence in this case do not provide [legally] sufficient information for a lodestar calculation, we must reverse and remand."). Therefore, we reverse the trial court's judgment as to the attorney's fee award and remand for a redetermination of fees consistent with this court's opinion.
*894 We sustain Mandy's and Shadow Creek's final issue regarding the itemization of Havey's attorney's fee evidence. We do not address Mandy's and Shadow Creek's challenge regarding segregation.
CONCLUSION
We conclude that (1) the evidence is legally insufficient to support the jury's "yes" answer in response to Question No. 9 with respect to Mandy's individual liability as Shadow Creek's alter ego; (2) Texas Business Organizations Code sections 21.223 and 21.224 bar the imposition of liability on Mandy for common law fraud and conspiracy, which makes the jury's "yes" answers in response to Questions No. 1 and 3 immaterial; and (3) the evidence is legally insufficient to support the attorney's fees awarded in the trial court's final judgment.
We reverse and render a take-nothing judgment in favor of Mandy. We reverse the $55,750 attorney's fee award included in the trial court's final judgment and remand the issue of attorney's fees for a redetermination consistent with this court's opinion. We affirm the remainder of the judgment.

Because they share the same last name, we will refer to Mandy Hong and her husband Mau Hong by their first names to avoid confusion.

Sections 21.223 and 21.224 previously were codified as Tex. Bus. Corp. Act Ann. art. 2.21. See Act of May 26, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 427.

Section 21.225 provides two additional exceptions to section 21.223's liability limitation. See Tex. Bus. Orgs. Code Ann. § 21.225 (Vernon 2012). Section 21.223"does not limit the obligation of a holder, beneficial owner, subscriber, or affiliate to the obligee of the corporation if that person: (1) expressly assumes, guarantees, or agrees to be personally liable to the obligee for the obligation; or (2) is otherwise liable to the obligee for the obligation under this code or other applicable statute." Id. Havey does not assert that these exceptions apply here, and we do not address them in our analysis.

This contention was raised in Shadow Creek's and Mandy's response and objections to Havey's motion for entry of judgment, which asserted that "[i]t would be improper to enter[ ] judgment on [Question No.] 9, and a take nothing [judgment] should be issued as to Mandy Hong." The trial court did not explicitly rule on Havey's motion for entry of judgment or on Shadow Creek's and Mandy's objections. Instead, the trial court signed a final judgment assessing liability against Mandy based on the jury's responses to Questions No. 1, 3, and 9. In doing so, the trial court implicitly overruled Shadow Creek's and Mandy's objections to Havey's motion for entry of judgment. See Tex. R. App. P. 33.1(a)(2)(A) (providing that error is preserved when the trial court ruled on the motion either expressly or implicitly); Lenz v. Lenz , 79 S.W.3d 10, 13 (Tex. 2002) (holding that appellant preserved complaint asserted in pre-judgment motion where trial court implicitly ruled on motion by virtue of judgment's substance).

This contention was raised in Shadow Creek's and Mandy's response and objections to Havey's motion for entry of judgment, which asserted that the jury findings in response to Questions No. 1 and 3 are immaterial. The trial court did not explicitly rule on Havey's motion for entry of judgment or on Shadow Creek's and Mandy's objections. Instead, the trial court signed a final judgment assessing liability against Mandy based on the jury's responses to Questions No. 1, 3, and 9. In doing so, the trial court implicitly overruled Shadow Creek's and Mandy's objections to Havey's motion for entry of judgment. See Tex. R. App. P. 33.1(a)(2)(A) (providing that error is preserved when the trial court ruled on the motion either expressly or implicitly); Lenz , 79 S.W.3d at 13 (holding that appellant preserved complaint asserted in pre-judgment motion where trial court implicitly ruled on motion by virtue of judgment's substance).

The Shadow Creek-United Texas Realtors exclusive listing agreement also included the following provision addressing attorney's fees:
ATTORNEY'S FEES: If Seller or Broker is a prevailing party in any legal proceeding brought as a result of a dispute under this Listing or any transaction related to or contemplated by this Listing, such party may recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees.

Havey's pre-trial motions included a motion for summary judgment on the breach of contract claim; a motion for default judgment; and a motion in limine. Havey also responded to a motion for partial summary judgment; a motion to strike; and a motion to quash.